*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0177P (6th Cir.)
File Name: 00a0177p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

CHRISTOPHER MACHACEK,
  *Petitioner-Appellant,*

  *v.*                                        No. 98-1815

GERALD HOFBAUER, Warden,
  *Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 97-71761—Nancy G. Edmunds, District Judge.

Argued: March 15, 2000

Decided and Filed: May 26, 2000

Before: MERRITT, DAUGHTREY, and MAGILL, Circuit
Judges.*

---

**COUNSEL**

**ARGUED:** Don Ferris, FERRIS & SALTER, Ann Arbor,
Michigan, for Appellant. Laura Graves Moody, OFFICE OF
THE ATTORNEY GENERAL, HABEAS CORPUS

---

* The Honorable Frank J. Magill, Circuit Judge of the United States
Court of Appeals for the Eighth Circuit, sitting by designation.

1

DIVISION, Lansing, Michigan, for Appellee. **ON BRIEF:** Don Ferris, FERRIS & SALTER, Ann Arbor, Michigan, for Appellant.    Laura Graves Moody, OFFICE OF THE ATTORNEY GENERAL, HABEAS CORPUS DIVISION, Lansing, Michigan, for Appellee.

MAGILL, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. MERRITT, J. (p. 15), delivered a separate dissenting opinion.

--------------------

## OPINION

--------------------

MAGILL, Circuit Judge.  Christopher Machacek appeals the district court's[1] denial of his application for a writ of habeas corpus following his conviction for first degree murder in a Michigan state court.   At the district court level, Machacek argued that the Michigan trial court erred in admitting an incriminating statement obtained in violation of his Fourth, Fifth and Sixth Amendment rights.  The district court denied Machacek's petition, finding his Fourth Amendment claim barred by *Stone v. Powell*, 428 U.S. 465 (1970), and his other claims to be meritless.  For reasons to be discussed, we affirm.

### I.  Background

On December 30, 1986, petitioner Christopher Machacek and Steven Stamper, both sixteen years old at the time, took Mary Ann Hulbert, who was thirteen years old, into the woods near Ann Arbor, Michigan, and shot her several times. Her body was found by two hunters on January 7, 1987. An autopsy performed on January 8, 1987, revealed that Mary Ann had been shot seven times from both the front and back, with the death bullet penetrating her heart and lungs.

--------------------

[1]The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan.

--------------------

### DISSENT

--------------------

MERRITT, Circuit Judge, dissenting.   I disagree with Section V of the Court's opinion.  As the Court's quotation of the transcript sets out, the detective who interrogated Machacek asked him to sign "directly below . . . a paragraph that is called Waiver of Rights" which says "I have read . . . my rights, and . . . I waive them . . ."  Immediately following this request for Machacek to sign the waiver, the detective said "we're not asking you to waive or give up any of your rights or anything of that nature."   This latter statement was false and in my opinion constitutes a blatant violation of *Miranda.*  The same detective then told Machacek the same thing again, a second time:   "[Signing the waiver] is not waiving anything," he said.   Machacek then signed the waiver.  Although I am certainly not anxious to reverse this case, I do not see how we can say anything other than that we cannot sanction this classic violation of *Miranda.*  Maybe a detailed harmless error analysis could sustain the state conviction, but I cannot go along with my colleagues' view that no constitutional error happened.  Machacek only signed the waiver of rights after being twice told he was waiving nothing.  In other words, he was falsely told that he could talk and get it off his chest without running the risk of incriminating himself.   I agree with the rest of the Court's opinion.

## VI. Conclusion

For the aforementioned reasons, we affirm the district court's denial of habeas relief to petitioner.

After the body of Mary Ann was discovered on January 7, 1987, police went to Machacek's house and requested that Diana McKenzie, Machacek's foster mother, bring him to the station. Ms. McKenzie agreed and escorted Machacek to the station. At the station, Detective Sergeant William McFarlane took Ms. McKenzie aside and told her that Mary Ann had been murdered. Ms. McKenzie then gave the police permission to talk to petitioner.

At 7:20 p.m., the formal interview began with Ms. McKenzie present. Because petitioner challenges the knowing and voluntary nature of his waiver of his Fifth and Sixth Amendment rights, we quote excerpts from the audio recordings of his interview at some length.[2]

Detective Stamper: This is a statement of your *Miranda* rights. Number One: You have the right to remain silent, which means you don't have to talk to us if you don't want to. Do you understand that one?

Machacek:          Yes.

Detective Stamper: Number Two: Anything you say can and will be used against you in a court of law. Do you understand that one?

Machacek:          Yes.

Detective Stamper: Number Three: You have the right to talk to a lawyer and have him present with you while you are being questioned. Do you understand that one?

Machacek:          Yes.

---

[2]We note that some of the audio recordings were made without the knowledge of the questioning officers.

Detective Stamper: Number Four:  If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish.  Do you understand that?

Machacek:          Yes.

Detective Stamper: Number Five:  You can decide at any time to exercise these rights and not answer any question or make any statements.  Do you understand that?

Machacek:          Yes.

Detective Stamper: Directly below is a paragraph that is called Waiver of Rights.  It says, "I have read the above statement of my rights and I understand each of these rights and having these rights in mind, I waive them and willingly make a statement."

We're not asking you to waive or give up any of your rights or anything of that nature.  Okay?

Machacek:          Yes.

Detective Stamper: Can you read?

Machacek:          Yes.

Detective Stamper: What I would like for you to do and don't get offended when I ask that because some people can't.  What I would like you to do is read those over and make sure they read exactly the way that I read them to you.  Make sure you understand them thoroughly.  Then if you do, I would ask you to sign it on that line that says, Signature, and your guardian-mother to sign underneath.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).  "Whether a waiver is knowing and intelligent is determined by the particular facts and circumstances of the case, 'including the background, experience, and conduct of the accused.'"  *See United States v. Gaddy*, 894 F.2d 1307, 1312 (11th Cir. 1990) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).  After extensive hearings, the state trial court determined that both Machacek and his legal guardian made the final decision to waive his *Miranda* rights freely and with full understanding.

We agree with the Michigan court.  Assuming that Detective Stamper may have somehow mislead Machacek about the consequences of signing the waiver card, police did not treat the signing of the card as a waiver of Machacek's rights.  Rather, after Machacek signed the waiver card, Detective Fulcher emphasized that Machacek's signature merely indicated his understanding of his legal rights.  After confirming that Machacek understood his rights, Detective Fulcher specifically asked Machacek whether he wanted to make a statement without an attorney being present.  Machacek agreed and admitted his involvement in the brutal murder of young Mary Ann Hulbert.[4]

Based on the "totality of the circumstances" surrounding Machacek's waiver, we find that the Michigan courts' determination that Machacek knowingly and voluntarily waived his *Miranda* rights was not an unreasonable application of Supreme Court precedent.  The audio recordings of Machacek's interview firmly convince us that both Machacek and his foster mother knowingly and intelligently waived his Fifth and Sixth Amendment rights.

---

[4]The record shows that Machacek had extensive contacts with the juvenile justice system and, thus, was not naive about the consequences of waiving his Fifth and Sixth Amendment rights.

"unreasonable application" of Supreme Court precedent. Thus, we must reject petitioner's request for habeas relief based on an alleged violation of his right to counsel.

### V.  Valid Waiver Of *Miranda* Rights

In his habeas appeal, petitioner also argues that the Michigan state courts erroneously found that Detective Stamper's misleading statements about the significance of signing a waiver card did not render his waiver of Fifth Amendment rights invalid.  Although we agree that Detective Stamper's statements were less than appropriate, we find the Michigan court's decision to be an "objectively reasonable" application of clearly established Supreme Court precedent, and, thus,  affirm the district court's denial of petitioner's request for habeas relief.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that the privilege against self-incrimination protects individuals from "informal compulsion exerted by law-enforcement officers during in-custody questioning." *Id.* at 461.  Unless a suspect knowingly, voluntarily, and intelligently waives these rights, a court will exclude statements made as a result of an involuntary waiver. *See Pennsylvania v. Muniz*, 496 U.S. 582, 589 (1990).  In determining whether a suspect has validly waived his rights, a trial court should consider the following factors:

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception.  Second, the waiver must have been made with full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the "totality of the circumstances surrounding the investigation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

Your signature is not an admission of anything. It is not waiving anything. It merely indicates that you have been read your rights and you do understand  each one of them.

Mrs. McKenzie:    Should . . . We're going to have to get a lawyer then and should his mother be notified?

Detective Fulcher:  Are you his legal guardian?

Ms. McKenzie:    Right now, yes.

Detective Fulcher:  Are you indicating that you don't want him to talk to us without an attorney being present?

Ms. McKenzie:    Well, what do you suggest?  I've never been through this.

Detective Fulcher:  It's not up to me.  It is one-hundred percent yours and Chris' decision.

. . .

Ms. McKenzie:    Well, does he have to sign that before our lawyer is here?

Detective Fulcher:  He doesn't have to sign anything.  We are asking him to sign it, if he understands his rights.

Questioning stopped at this point and Ms. McKenzie left the room to talk to her ex-husband. Ms. McKenzie returned to the room approximately five minutes later and the following conversation took place.

Detective Fulcher:  Chris, we have talked about your rights. You have signed the form and you are indicating that you do understand your

rights and you would like   to talk to us about the death of Mary.

Machacek:         Yes.

Detective Fulcher:   And Mrs. McKenzie, do you understand his rights and you are allowing him  to talk to us about that now?

Mrs. McKenzie:    Um-humm.

Detective Fulcher:   We haven't threatened anyone or made any promises or anything of that  nature?

Ms. McKenzie:     No, but I just want Chris to tell the honest-to-god truth of what he knows and  you can take a lie detector's test and that would maybe clear it.

Detective Fulcher:   Do you feel that we have threatened or intimidated you in any way to get you  to talk to us, Chris?

Machacek:         No.

   At this point, Ms. McKenzie asked petitioner whether he told anyone that he had access to her husband's Chevy Blazer. The officers discussed the issue with Ms. McKenzie before continuing with the following conversation.

Detective Fulcher:   Chris, I  would  like  to  refresh you memory about the rights. The blue form that you signed – I will lay it in front of you.  It indicates all those rights.  Do you recall reading me those rights to you a short time ago or Detective  Stamper, I should say, reading the rights to you?

Machacek:         Yes.

Detective Fulcher:   Do you still understand your rights?

1522.  Thus, even if we believe that a state court incorrectly applied federal law, we must refuse to issue the writ of habeas corpus if we find that the state court's decision was a reasonable one.  Given the facts of this case, we have little trouble deciding that the Michigan court's decision was "objectively reasonable" in light of clearly established federal law.

   Machacek argues that Ms. McKenzie, his legal guardian, invoked his right to counsel by making the following remark, "Should . . . We're going to have to get a lawyer then and should his mother be notified?"  In light of the Supreme Court's decision in *Davis v. United States*, 512 U.S. 452 (1994), we reject petitioner's argument.  In *Davis*, the Court held that a suspect "must unambiguously request counsel." *Id.* at 459.  Thus, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.*  The Court ultimately held that the suspect's statement, "Maybe I should talk to a lawyer," was equivocal, and, thus, police were allowed to continue questioning the suspect. *Id.* at 462.

   In light of *Davis*, the Michigan court's finding that Ms. McKenzie did not invoke the right to counsel was "objectively reasonable."  Her equivocal statement began and ended as if she were asking the police a question.  After Ms. McKenzie ambiguously suggested that she might want counsel present during questioning, police immediately stopped questioning Machacek and asked Ms. McKenzie to clarify whether she was invoking Machacek's right to counsel. Ms. McKenzie's response indicated that she was very uncertain about whether she wanted counsel present.  Before continuing the questioning, police allowed Ms. McKenzie to leave the room and discuss the matter with her ex-husband. Upon her return, she unequivocally consented to proceeding without having a lawyer present.  Given the facts of this case, we cannot say the state trial court's determination was an

(d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . .

28 U.S.C. § 2254(d).  After we heard oral arguments in this case, the Supreme Court resolved some confusion among the circuits by holding that section 2254(d)'s "contrary to" and "unreasonable application" clauses  have independent meanings. *See Williams v. Taylor*, 120 S.Ct. 1495, 1519 (2000).  With respect to the first of the two statutory clauses, the Court held that a state court decision can be "contrary to" clearly established federal law  if  the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law. *See id.*  A state court decision can also be "contrary to" Supreme Court precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result. *See id.*  Because none of Machacek's claims implicate the "contrary to" clause of this provision, we will evaluate his claims under the "unreasonable application" prong.

In *Williams*, the Court held that an "unreasonable application" of clearly established federal law established by Supreme Court precedent occurs if "the state court identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 1520.  Thus, "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively reasonable." *Id.*  Although the Court failed to specifically define "objectively reasonable," it observed that "an unreasonable application of federal law is different than an incorrect application of federal law." *Id.* at

| Machacek: | Yes. |
|---|---|
| Detective Fulcher: | Having those rights in mind, do you still want to make a statement without your attorney being present now? |
| Machacek: | Yes. |

After agreeing to make a statement to the officers, Machacek described the murder of Mary Ann, implicating Steven Stamper as the one who pulled the trigger.  Machacek told police how the two boys took Mary Ann to the woods, blindfolded her, placed her up against a tree, and shot her numerous times as she ran trying to escape from  her abductors.  After shooting and killing the young girl, Machacek helped Stamper drag Mary Ann's body through the woods and dump her in some bushes.

## II.  Procedural History

In determining whether to exclude Machacek's incriminating statements, the Michigan trial court held a *Walker* hearing[3] and listened to the tape recordings of Machacek's interview.  The trial court concluded:

In this case, Defendant Machacek was informed of his *Miranda* rights in the presence of his foster mother, Diana McKenzie.  It is clear that he and she understood those rights.  She was given the opportunity to discuss these rights and whether or not an attorney should be called with her ex-husband.  During this time Defendant Machacek was not being questioned and could reflect on whether he wanted to proceed.  The record shows that the final decision was made freely with full understanding.

---

[3]A *Walker* hearing is a hearing held in the Michigan state courts, outside the presence of the jury, to determine whether a confession was voluntarily made. *See People v. Walker*, 374 Mich. 331 (1965).

On appeal, the Michigan Court of Appeals affirmed the trial court's ruling, finding that:

> Our review of the record, which includes audio tapes made without the knowledge of the officers questioning defendant, leaves us convinced that defendant's statement was voluntarily made, that his rights were scrupulously honored, and that both he and his foster mother knowingly and intelligently waived his right to remain silent and to have an attorney present during the questioning. We therefore find the remainder of defendant's claims regarding the admissibility of his statement to be without merit.

On September 14, 1988, a jury convicted Machacek of first degree murder. He was sentenced to a mandatory life sentence without possibility of parole. On April 4, 1989, Machacek filed a claim of appeal with the Michigan Court of Appeals challenging the trial court's refusal to suppress the incriminating statement he made to police on January 7, 1987. Machacek also appealed the trial court's finding that officers had probable cause to believe that he was guilty of murder. On February 17, 1993, the Michigan Court of Appeals affirmed Machacek's conviction. The Michigan Supreme Court denied his application for leave to appeal the appellate court's decision.

On April 21, 1997, Machacek filed for a writ of habeas corpus with the United States District Court for the Eastern District of Michigan, arguing that the Michigan court erred in allowing an incriminating statement obtained in violation of his Fourth, Fifth and Sixth Amendment rights to be introduced into evidence at trial. On June 30, 1998, the district court denied his petition for a writ of habeas corpus. This appeal followed. For reasons to be discussed, we affirm the district court's ruling in its entirety.

### III. *Stone v. Powell* Bars Petitioner's Fourth Amendment Claim

Petitioner's Fourth Amendment claim is not reviewable. A habeas petitioner may not seek habeas relief on a claim of illegal arrest if he had a full and fair opportunity to raise the claim in state court and presentation of the claim was not thwarted by any failure of the state's corrective processes. *See Stone v. Powell*, 428 U.S. 465, 494-95 (1976). In *Riley v. Gray*, 674 F.2d 522 (6th Cir. 1982), we set forth two distinct inquiries a court must perform when determining whether a petitioner may raise a claim of illegal arrest in a habeas action. First, the "court must determine whether the state procedural mechanism, in the abstract, presents the opportunity to raise a fourth amendment claim. Second, the court must determine whether presentation of the claim was in fact frustrated because of a failure of that mechanism." *Id.* at 526. Because Machacek concedes that Michigan has a procedural mechanism which presents an adequate opportunity to raise his Fourth Amendment claims, he must establish that a failure of that procedural mechanism somehow prevented him from litigating his claims.

In this case, the record reflects that petitioner was able to present his Fourth Amendment claims to the Michigan courts and that these claims were carefully considered and rejected at the trial level and on appeal. Machacek may be disappointed with his inability to persuade the Michigan courts that his statement was the product of an illegal arrest, but the record clearly shows that he received all the process he was due. Accordingly, any claims concerning the validity of his arrest are not cognizable on habeas review under the doctrine of *Stone v. Powell*.

### IV. Failure To Invoke Right To Counsel

Machacek filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d). Thus, the district court's review was limited to the standards of review set out in the AEDPA as follows: