**UNITED STATES of America,**
**Plaintiff,**

v.

**Tyson BUSH, Defendant.**

**No. CR–3–99–046.**

United States District Court,
S.D. Ohio,
Western Division.

Nov. 2, 2000.

Margaret Quinn, Dayton, OH, for Plaintiff.

Beth Goldstein, Dayton, OH, for Defendant.

## DECISION AND ENTRY OVERRULING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS (DOC. # 23); DECISION AND ENTRY OVERRULING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (DOC. # 38)

RICE, Chief Judge.

The Defendant is charged in the Indictment with one count of bank robbery, in violation of 18 U.S.C. § 2113(a). This prosecution is now before the Court on the Defendant's Motion to Suppress Statements (Doc. # 23) and his Motion to Suppress Evidence (Doc. # 38).[1] With the first of those motions, Defendant argues that the statements he gave to police officers, after having been arrested on April 16, 1999, must be suppressed, because he did not voluntarily and knowingly waive his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), reaffirmed by *Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). With his Motion to Suppress Evidence (Doc. # 38), Defendant requests that the Court suppress all evidence that was obtained as a result of his arrest on that date, claiming that the arrest violated the Fourth Amendment.[2] On August 19, 1999, March 10, 2000 and March 15, 2000, the Court conducted oral and evidentiary hearings on those two motions. In accordance with the Court's briefing schedules, the parties have filed post-hearing memoranda. As a means of analysis, the Court will initially set forth the circumstances giving rise to the Defendant's two motions, following which it will rule upon them in the order in which they were filed.

During the early afternoon of April 16, 1999, a robbery occurred at the Key Bank branch located at 2455 Stanley Avenue, Dayton, Ohio, near the corner of that road and Troy Street. Officer Stephen Coulton ("Coulton") of the Dayton Police Department was immediately dispatched to that location. As Coulton pulled into the bank's parking lot, he was approached by a citizen named Alton Gott ("Gott"). Gott told the officer that he had seen bank employees come out of the bank, yelling at a young, African–American male. Gott informed Coulton that he had seen that individual flee south out of the bank, through open fields. Feeling compelled to do something, Gott explained that he had followed the young, African–American male to an apartment complex on Kelly Avenue, where he (the young, African–American male) had met a young, white female with blond hair.

Coulton then left the bank parking lot and proceeded north on Troy Street toward Kelly Avenue and the apartment building where Gott had last seen the two

---

1. Certain routine discovery related motions are pending, which the Court will rule upon by separate entry.

2. Neither the Defendant nor the Government has identified what, if any, evidence was obtained from the Defendant, after he was arrested on April 16, 1999. Defendant's statements are the only apparent evidence obtained as a result of his arrest.

individuals. As he approached Kelly Avenue, Coulton observed a young, African–American male and a young, white female with blond hair walking north on Troy Street, just north of the intersection of that thoroughfare and Kelly Avenue. At that point, Coulton used his radio to alert other officers that he believed he had the suspect in sight and to request backup. While Coulton talking on his radio, Gott pulled up next to the officer's cruiser and identified the young African–American male as the individual whom he had followed a few minutes earlier from the bank. While Coulton was awaiting backup, he continued to follow the two individuals as they walked north on Troy Street.

Sargent Mannix ("Mannix") and Officer Michelle Moser ("Moser"), also of the Dayton Police Department, were in a cruiser near the corner of Troy Street and Stanley Avenue, when they received Coulton's request for backup. With Moser driving, they traveled north on Troy Street and passed Coulton's cruiser, so that they could position themselves in front of the two individuals. Moser drove her cruiser onto the sidewalk in front of the young, African–American male and the young, white female with blond hair, while Coulton positioned his vehicle behind those two individuals. As the officers were exiting their vehicles with weapons drawn, Mannix told the two individuals to raise their hands and to lie on the ground. As the female was complying with that command, her coat opened, resulting in currency being released and blowing around the area. At that point, the officers placed handcuffs on both of the individuals and took them into custody. Approximately five minutes had elapsed since officers had first been dispatched to the bank on the report of a robbery. The young, African–American male was identified as Tyson Bush, the Defendant herein.

After the Defendant had been arrested, he was transported to the Dayton Safety Building, located on West Third Street. He was taken to an interview room, which measured approximately six feet by seven feet and had no window. The Defendant was joined by Detective Steven Hummons ("Hummons") of the Dayton Police Department. Hummons walked into the interview room, introduced himself and told the Defendant that he wanted to ask him some questions. However, before beginning the interrogation, Hummons read the *Miranda* warnings to the Defendant. After Hummons had read each one of the warnings, he asked the Defendant if he understood that particular right. Defendant indicated that he understood each of his rights. Hummons read the warnings from a pre-interview form. After having read the warnings, he turned toward the Defendant and asked him to read the form.[3] Defendant indicated that he was able to read, and initialed each of the warnings after having read it. Hummons then read a waiver of rights to the Defendant, which he signed. Hummons then asked the Defendant whether he would like to make a statement, to which the Defendant replied affirmatively. The Defendant explained that, when he had awakened that morning, he felt that he was either going to rob a bank or to kill himself. At that point, Hummons asked the Defendant whether he would like to put his statement in writing. When the Defendant indicated that he would, Hummons gave him a statement form and a pen. As the Defendant began to write, he started to cry. Hummons left the interview room to obtain a box of Kleenex for the Defendant, and, when he returned, the Defendant was writing his statement.[4]

After Defendant had provided his written statement to Hummons, he was interviewed by Special Agent Donald Riedman

---

3. The pre-interview form, which also contains a waiver of rights signed by the Defendant, is Government Exhibit 1 to the August 19, 1999, oral and evidentiary hearing.

4. The Defendant's statement is Government Exhibit 2 to the August 19, 1999, oral and evidentiary hearing.

("Riedman") of the Federal Bureau of Investigation and Detective Jeff Colvin ("Colvin") of the Huber Heights Police Department. Those two law enforcement officers entered the interview room and told Defendant that they wanted to ask him questions about the bank robbery for which he had been just arrested. As had Hummons, Riedman read Defendant the *Miranda* warnings from a pre-interview form, before questioning him. Defendant indicated that he understood his rights and signed a waiver of those rights on the bottom of the pre-interview form.[5] Defendant admitted to Riedman and Colvin that he had robbed the Key Bank branch, again explaining that he had awakened that morning with the feeling that he was either going to rob a bank or to kill himself. Defendant also explained to the officers that his father had not been around when he was growing up, that he had not finished school and that he was not able to hold a job. In addition, the Defendant indicated that the young female with whom he had been arrested did not know that he was planning to rob a bank. Riedman and Colvin also asked Defendant about two previous bank robberies in which he was a suspect. Defendant denied any involvement in those incidents and seemed to the officers to be curious as to why he had not been arrested, if in fact they had evidence that he had been involved in them.

### I. Motion to Suppress Statements (Doc. # 23)

The Defendant argues that the Court must suppress his statements, because his waiver of his *Miranda* rights was not voluntary and knowing. Under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), statements made by a defendant during a custodial interrogation must be suppressed, unless he has been provided certain warnings and has waived

his rights.[6] A defendant may waive the rights conveyed by the *Miranda* warnings, provided the waiver is made voluntarily and knowingly. *Miranda*, 384 U.S. at 475, 86 S.Ct. 1602. The Government bears the burden of proving by a preponderance of the evidence that a defendant so waived his *Miranda* rights. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). In *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), the Supreme Court noted that the question of whether a defendant has waived his *Miranda* rights has two distinct components:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). See also *North Carolina v. Butler*, 441 U.S. 369, 374–375, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).

*Id.* at 421, 106 S.Ct. 1135. Based upon the evidence presented during the suppression hearing, this Court finds that the Defendant voluntarily and knowingly waived his rights under *Miranda*.

With respect to the question of whether the Defendant voluntarily waived his rights, the Supreme Court has stressed that a waiver of *Miranda* rights is involuntary only when it is the product of official coercion. *Connelly*, 479 U.S. at 170, 107

---

5. That pre-interview form and waiver of rights signed by the Defendant is Government Exhibit 4 to the August 19, 1999, oral and evidentiary hearing.

6. Herein, it cannot be questioned that the law enforcement officials subjected Defendant to custodial interrogations when they questioned him at the Dayton Safety Building.

S.Ct. 515.[7] Herein, there is not the slightest hint that the Defendant's statements were the product of coercion or intimidation by the law enforcement officials who interrogated him. Thus, the Court finds that the Defendant voluntarily waived his rights and turns to the question of whether that waiver was knowing.

The Government seemingly conflates the inquiry as to whether the Defendant voluntarily waived his rights with the issue as to whether he knowingly did so. Relying upon *Connelly*, the Government argues that a waiver is both voluntary and knowing, unless there is evidence of coercion by police officials. Defendant, on the other hand, contends that he did not knowingly waive his rights, because he was under the influence of LSD when he was interviewed by the officers. As a means of analysis, the Court will initially address the Government's contention that the Defendant knowingly waived his rights, in the absence of evidence that his actions were the product of police coercion. If the Court rejects that contention, it will turn to the Defendant's assertion that his waiver was not knowing, because he was under the influence of LSD.

In light of *Connelly*, the Courts of Appeals have unanimously held that the absence of police coercion renders a defendant's waiver of rights merely voluntary, as opposed to causing it to be *both* voluntary *and* knowing. For instance, in *United States v. Turner*, 157 F.3d 552 (8th Cir.1998), the Eighth Circuit rejected the Government's argument that, pursuant to *Connelly*, the defendant had knowingly waived his *Miranda* rights, because there was no evidence of police coercion, writing:

> In this case, the government responds that because Turner does not contest the district court's finding of no police coercion, this court need not address Turner's arguments concerning the validity of his waiver. We disagree. It is true, as the government notes, that in *Connelly*, 479 U.S. at 167, 107 S.Ct. 515, the Supreme Court held "that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" However, later that term, in *Colorado v. Spring*, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987), the Supreme Court made clear that validity of a *Miranda* waiver has "'two distinct dimensions'"—whether the waiver is voluntary and whether it is knowing and intelligent. *Id.* at 573 (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)).

*Id.* at 555. *See also, United States v. Bradshaw*, 935 F.2d 295, 299 (D.C.Cir. 1991) (reading *Connelly* as holding only that "police coercion is a necessary prerequisite to a determination that a waiver was involuntary and not as bearing on the separate question whether the waiver was knowing and intelligent"); *Derrick v. Pe-*

7. In *Connelly*, the defendant voluntarily approached a police officer and stated that he wanted to confess to a murder. After the officer had read the *Miranda* warnings to the defendant and stressed that he was not obligated to say anything, the defendant confessed to murdering a young girl a number of months earlier. After the defendant had been charged with murder, the defendant moved to suppress his confession, arguing that it had been involuntary, since he had confessed as a result of being told to do so by voice he had heard, which he perceived to be the voice of God. The trial court suppressed the confession, and the Colorado Supreme Court affirmed. Upon further appeal, the United States Supreme Court held that neither the Due Process Clause of the Fourteenth Amendment, which prohibits the introduction of involuntary confessions, nor the Fifth Amendment, as interpreted by *Miranda*, mandated the suppression of the defendant's confession. The *Connelly* Court concluded that the confession was not involuntary, given that it was not the product of official coercion. *See* 479 U.S. at 167, 107 S.Ct. 515 (holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment"); *id.* at 169–70, 107 S.Ct. 515 (noting that there is no reason to require that the voluntariness inquiry under *Miranda* be more strict than under the Due Process Clause of the Fourteenth Amendment).

*terson,* 924 F.2d 813, 820 (9th Cir.1990) ("[w]hatever doubt remained after *Connelly* concerning the distinct nature of the knowing and intelligent prong of the waiver inquiry was removed by the Court's decision in *Colorado v. Spring* "), *cert. denied,* 502 U.S. 853, 112 S.Ct. 161, 116 L.Ed.2d 126 (1991); *Miller v. Dugger,* 838 F.2d 1530, 1539 (11th Cir.) (noting that in *Connelly* the Supreme Court did not eliminate the distinction between voluntariness and knowing waivers), *cert. denied,* 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988). Although the Sixth Circuit has not decided the question,[8] that court has indicated, in post-*Connelly* decisions, that the question of whether a defendant has waived his *Miranda* rights involves two distinct inquiries, to wit: was the waiver voluntary and was it knowing. *See e.g., Machacek v. Hofbauer,* 213 F.3d 947, 952 (6th Cir.2000). Indeed, therein, the Sixth Circuit noted that whether a waiver is knowing depends upon the totality of the circumstances, including the background, experience and conduct of the defendant. *Id.* Decidedly missing from the factors listed by the Sixth Circuit is whether the police engaged in coercive conduct.

■ Based upon the foregoing, the Court concludes that a defendant's waiver of his *Miranda* rights may not have been knowing, even in the absence of police coercion. Accordingly, the Court turns to the Defendant's contention that he did not knowingly waive those rights, because he was under the influence of LSD when questioned by the officers.

Defendant bases that argument on testimony Harvey Siegal, Ph.D. ("Siegal"). Siegal interviewed the Defendant the day before the August 19, 1999, oral and evidentiary hearing, a date some four months after he had been arrested and interviewed. Siegal testified that the Defendant had told him that he had smoked a significant amount of crack cocaine and marijuana the night before the robbery of the bank and that, upon awakening the next day, he smoked more crack cocaine and marijuana. Siegal also indicated that the Defendant had told him that, on the day of the bank robbery, he (Defendant) had ingested three tabs of LSD and two vials of liquid LSD. According to Siegal, the effects of the crack cocaine and marijuana which the Defendant had smoked prior to the bank robbery would have worn off by the time he was interviewed and, thus, would not have interfered with his ability to waive his rights knowingly. However, Siegal testified that the amount of LSD taken by the Defendant could have compromised his ability to comprehend fully what he was doing by waiving his rights.

Although this Court does not question that Siegal accurately testified as to what the Defendant had told him about the quantity of LSD he had taken on the morning of April 16, 1999, the Court cannot find that the Defendant's ability to comprehend what he was doing when he was asked, on two occasions, to execute a written waiver of his rights was impaired on that date. Such a finding would contradict the other evidence presented at the suppression hearing. Hummons, Riedman and Colvin all testified that, when they spoke with the Defendant on April 16th, he appeared to be normal and did not act inappropriately. Those officers also testified that the Defendant had indicated that

---

**8.** The Sixth Circuit decisions cited by the Government do not support the proposition that, in the absence of police coercion, a defendant's waiver of his rights was *knowing.* On the contrary, those cases cite *Connelly* for the proposition that police coercion is necessary to finding that a defendant's waiver of his rights was *voluntary. See e.g., United States v. McRae,* 156 F.3d 708, 711 n. 3 (6th Cir.1998) (noting that, although the defendant had alluded to the issue the voluntariness of his post-arrest statement in his statement of facts of his brief, he had not raised the issue on appeal and that, in any event, the defendant's intoxication did not render the statement involuntary, since *Connelly* holds that police coercion is a necessary predicate to a finding of involuntariness). In *McRae,* the Sixth Circuit did not address the question of whether police coercion is also a predicate for finding that a defendant's waiver of rights was *knowing.*

he understood his rights, as the warnings were being read to him. Moreover, the actions of the Defendant belie the proposition that he was unable to comprehend the waiver of his rights. The Defendant's written statement (Government's Exhibit 2) does not present an individual who lacks comprehension; rather, the Defendant is attempting to make the best out of a bad situation. He had just been arrested for bank robbery, and attempted to explain his actions, by indicating that he had grown up without a father and was unable to hold a job. In addition, the Defendant wrote that he had awakened that morning feeling that he would either rob a bank or commit suicide. The Defendant also explained in his written statement that he had not intended to hurt or to scare anyone. Moreover, the Defendant had sufficient comprehension of what was happening to deny that he had been involved in previous bank robberies, and to challenge his interrogators about the evidence concerning those crimes. The Defendant also gave an exculpatory statement about his girlfriend. Additionally, there is no evidence that the Defendant indicated that he had taken LSD on the day of his arrest. All of the foregoing compels this Court to find that the Defendant waived his *Miranda* rights in full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them. Consequently, the Court concludes that the Defendant knowingly waived those rights.

Accordingly, based upon the foregoing, the Court overrules the Defendant's Motion to Suppress Statements (Doc. # 23).

## II. Defendant's Motion to Suppress Evidence (Doc. # 38)

The Defendant requests that the Court suppress all evidence obtained as a result of his arrest, asserting in his post-hearing memoranda that, when the officers initially confronted or seized him (i.e., when Coulton, Mannix and Moser told him and his companion to raise their hands and to lie on the ground), they had arrested him. The Defendant argues further that the officers did not have probable cause to arrest him at that time. In response, the Government does not contend that probable cause to arrest the Defendant existed at that moment. Rather, the Government argues that the initial confrontation with or seizure of the Defendant was a permissible stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which was supported by reasonable suspicion. In addition, the Government contends that, once the officers saw the currency flying from the coat of Defendant's female companion, they did have probable cause to arrest the Defendant. They did so at that time. In response, the Defendant does not challenge two of the Government's premises, i.e., that the officers had reasonable suspicion to believe that the Defendant had been engaged in criminal activity, when they stopped him, and that probable cause to arrest the Defendant existed once the officers had seen the currency released from under his companion's coat.[9] Rather, the Defendant continues to argue that the initial confrontation constituted an arrest which was not supported by probable cause, thus challenging the Government's assertion that the initial confrontation with or seizure of the Defendant was a permissible *Terry* stop. To rule upon this motion, the Court must initially resolve the issue of whether the initial confrontation between the Defendant and the officers constituted an arrest.[10] The Court begins its analysis by briefly reviewing the factual circumstances of the Defendant's confrontation with the officers on April 16, 1999.

9. As is explained below, such arguments would have been fruitless.

10. The Government has the burden of proving, by the preponderance of the evidence, that the warrantless seizure of the Defendant comported with the Fourth Amendment. *See United States v. Porter*, 701 F.2d 1158 (6th Cir.), *cert. denied*, 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983).

As the Defendant and his female companion were walking north on Troy Street, the officers maneuvered their police cruisers to block the Defendant, with the cruiser in which Moser and Mannix were occupants being positioned in front and Coulton's cruiser being placed to the rear. As the officers' vehicles were coming to a stop, Mannix told the Defendant and his companion to raise their hands and to lie on the ground. When they exited from their vehicles, all three officers had their weapons drawn. The Defendant complied with the command. As the female was complying, her coat opened and currency began to fly from under it. At that point, the Defendant and the female were placed in handcuffs and taken into custody.

In arguing that the initial seizure of the Defendant was a *Terry* stop, which had to be supported by reasonable suspicion, rather than an arrest which was permissible only if probable cause existed, the Government relies upon *Houston v. Clark County Sheriff Deputy*, 174 F.3d 809 (6th Cir.1999), and *United States v. Hardnett*, 804 F.2d 353 (6th Cir.1986). In *Houston*, two sheriffs deputies, Schutte and Hooper, were dispatched to a bar, at approximately 2:00 a.m., to investigate a reported theft. After they had completed their investigation and were leaving that establishment, fights broke out in the bar's parking lot, as it was closing. When Schutte and Hooper attempted to break up the fights, a crowd attacked them with bottles and rocks. During that altercation, the deputies heard a popping sound and someone exclaim "he's been shot." Schutte and Hooper then saw a security guard lying on the ground, with blood pouring from a wound on his head. They assumed that he had been shot and feared that he had been killed. At that point, Schutte saw someone get into a car and flee the scene. He suspected that the individual who had fled in the automobile had shot the security guard. The officer radioed that information to the dispatcher and requested assistance. Hooper heard Schutte's radio broadcast and attempted to follow the vehicle in which the suspect had fled. Schutte, contacted by Hooper by radio, although not able to describe the vehicle, did attempt to tell Hooper how many cars were between his cruiser and the suspect's vehicle. Hooper, however, misunderstood Schutte's method of identifying the suspect's vehicle and stopped a vehicle occupied by plaintiffs. Hooper drew his weapon and ordered the plaintiffs out of their car. Hooper was soon joined by two Ohio Highway Patrol officers who also aimed weapons at the plaintiffs. When the plaintiffs got out of their car, they were told to lie on the ground, after which they were handcuffed and placed in the back of a cruiser. The plaintiffs were then questioned for approximately 30 minutes. While the plaintiffs were being interrogated, Schutte learned that the security guard had not been shot; rather, he had been hit in the head with a bottle. In addition, he was unable to identify the suspect he had seen fleeing from the bar. When the officers were unable to discover any further evidence implicating the plaintiffs with the assault on the security guard, they were released. Subsequently, the plaintiffs brought an action under 42 U.S.C. § 1983, alleging, *inter alia*, that Hooper and the Highway Patrol officers had violated their rights under the Fourth Amendment, because their seizure was a *de facto* arrest which was not supported by probable cause. The District Court granted summary judgment to the defendants on that claim. Upon appeal, the Sixth Circuit affirmed that decision, concluding that the plaintiffs' seizure was a permissible *Terry* stop, rather than being a *de facto* arrest. Of particular present importance, the Sixth Circuit concluded that the force used to effect the seizure did not transform it into an arrest, writing:

[W]hen police officers reasonably fear that suspects are armed and dangerous, they may order the suspects out of a car and may draw their weapons when those steps are "reasonably necessary for the

protection of the officers." *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir.1993).

174 F.3d at 814–15.

In *Hardnett*, the defendant was suspected of being armed, and police officers stopped his vehicle, approaching it with their weapons drawn and ordering him out of the car. When the defendant exited from his automobile, officers saw a rifle, which they seized. The defendant was subsequently charged with being a felon in possession of a weapon. The defendant moved to suppress the weapon, arguing that his initial seizure had been an arrest, because the officers used force to effect that seizure, and that the arrest had not been supported by probable cause to believe that he had committed a crime. The District Court overruled that motion, and, after the defendant had been convicted, he appealed, contending that the District Court had erred in failing to suppress the rifle. The Sixth Circuit disagreed, writing:

> Looking at all the circumstances surrounding the seizure of Hardnett, we do not find that the officers' conduct was so intrusive as to constitute an arrest. We recognize that the officers' show of force—approaching Hardnett's car with their guns drawn and ordering the occupants out of the car at gunpoint—was highly intrusive and under some circumstances would certainly be tantamount to an arrest. However, the mere use or display of force in making a stop will not necessarily convert a stop into an arrest. *United States v. Greene*, 783 F.2d 1364, 1367 (9th Cir.), *cert. denied*, 476 U.S. 1185, 106 S.Ct. 2923, 91 L.Ed.2d 551 (1986); *United States v. White*, 648 F.2d 29, 34 (D.C.Cir.), *cert. denied*, 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233, 70 L.Ed.2d 235 (1981). Where the display or use of arms is viewed as "reasonably necessary for the protection of the officers," the courts have generally upheld

investigative stops made at gunpoint. *See White*, 648 F.2d at 34–35, and cases cited therein; *see also United States v. Danielson*, 728 F.2d 1143, 1147 (8th Cir.), *cert. denied*, 469 U.S. 919, 105 S.Ct. 300, 83 L.Ed.2d 235 (1984). That is, if the surrounding circumstances give rise to a justifiable fear for personal safety, a seizure effectuated with weapons drawn may properly be considered an investigative stop. *See Greene*, 783 F.2d at 1367–68.

804 F.2d at 357. *See also, United States v. Powell*, 2000 WL 357262 (6th Cir.2000) (unreported) (noting that "[t]he Supreme Court, this circuit, and numerous federal courts have repeatedly held that when an officer reasonably believes that a suspect is armed, he may—among other things—handcuff the suspect, block the suspect's vehicle, require the suspect to lie prone on the ground, and even approach the suspect with a drawn firearm").

Applying the foregoing standards to this prosecution, the Court must decide whether the officers who seized the Defendant had a justifiable fear for their safety. Herein, the Defendant was suspected of having committed a bank robbery a matter of minutes before the officers seized him. Given the nature of such offenses and the temporal proximity between the commission of the offense and the seizure of the Defendant, this Court concludes that the officers had a justifiable fear for their safety when they used force to seize the Defendant. *See United States v. Alvarez*, 899 F.2d 833 (9th Cir.1990), *cert. denied*, 498 U.S. 1024, 111 S.Ct. 671, 112 L.Ed.2d 663 (1991) (officers who had received an anonymous tip that the defendant had been involved in a bank robbery were justified in using force to effectuate a *Terry* stop on him). Accordingly, the Court concludes that the initial seizure of the Defendant constituted a *Terry* stop, rather than an arrest.[11] Accordingly, the Court turns to

---

11. Based upon testimony by Coulton, Defendant argues that the officers intended to arrest him and that, therefore, his seizure was

an arrest which had to be supported by probable cause. This Court does not interpret that testimony in the same manner as the Defen-

the question of whether the initial seizure of Defendant was supported by reasonable suspicion.

■ In *Houston, supra,* the Sixth reviewed the standards which are applicable to determine whether a seizure is permissible under *Terry:*

> Police may briefly stop an individual for investigation if they have a "reasonable suspicion" that the individual has committed a crime. *United States v. Palomino,* 100 F.3d 446, 449 (6th Cir. 1996).... "Reasonable suspicion" is more than an ill-defined hunch; it must be based upon "a particularized and objective basis for suspecting the particular person ... of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). It requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" an investigatory stop. *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Erwin,* 155 F.3d 818, 822 (6th Cir.1998), *cert. denied,* 525 U.S. 1123, 119 S.Ct. 906, 142 L.Ed.2d 904 (1999). The standard outlined in *Terry* and its progeny is not onerous. The requisite level of suspicion "is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *McPherson v. Kelsey,* 125 F.3d 989, 993 (6th Cir.1997),

*cert. denied,* 523 U.S. 1050, 118 S.Ct. 1370, 140 L.Ed.2d 518 (1998). Moreover, reasonable suspicion can arise from evidence that is less reliable than what might be required to show probable cause. *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990); *McPherson,* 125 F.3d at 993.

174 F.3d at 813. Herein, Gott told Coulton that the individual he had seen running from the Key Bank branch was a young, African–American male in the company of a young, white female with blond hair and that the two had been at an apartment building on Kelly Avenue. That officer subsequently saw the Defendant, a young, African–American male, walking on Troy Street, just north of where that street intersects with Kelly Avenue, in the company of a young, white female with blond hair. As Coulton was using his radio to inform other officers of his observations, Gott approached him and identified the Defendant as the person he had seen running from the bank.[12] Moreover, the Defendant was seized only a few blocks from the bank on Stanley Avenue, approximately five minutes after that financial institution had been robbed. All of those specific and articulable facts convince this Court that there existed reasonable suspicion to believe that the Defendant had been engaged in criminal activity, i.e., robbing the Key Bank branch on Stanley Avenue.

■ After the Defendant and his companion had been ordered to lie on the

---

dant. In response to a question by Government's counsel as to what Coulton had done after he had spoken to Gott the second time, the officer testified, "[b]asically, like I say, when the officers got their arrival (sic), we proceeded to shout orders to get on the ground and to institute the arrest at that point." Doc. #60 at 15. Given that the currency flew from the female's coat as she was complying with the order that she lie on the ground, the arrest occurred immediately after the Defendant had been ordered to lie on the ground. Coulton's testimony is most appropriately interpreted as explaining that course of events, rather than indicating that the officers were arresting Defendant when they initially confronted him.

12. The Defendant argues that Coulton's testimony concerning his second meeting with Gott is not credible, because it was not included in the report concerning the events of April 16, 1999, which he had written shortly thereafter. This Court does not agree; rather, it finds Coulton's testimony to be credible. Coulton explained that he had merely failed to include all the details of the day's events in his report. Moreover, Coulton explained that he had not forgotten the events of April 16, 1999, since, in his 20 years as a police officer, that was the first and only time he had been involved in the arrest of a bank robber.

ground, the officers saw currency fly from under the young female's coat. Thus, the question is whether that observation, coupled with the specific and articulable facts which gave the officers reasonable suspicion to believe that the Defendant had robbed the bank, established probable cause to believe that he had engaged in that activity. It is well-settled that a warrantless arrest, in a public place, does not violate the Fourth Amendment, as long as probable cause existed. *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *United States v. Dotson,* 49 F.3d 227 (6th Cir.), *cert. denied,* 516 U.S. 848, 116 S.Ct. 141, 133 L.Ed.2d 87 (1995). In *Dotson,* the Sixth Circuit explained the test to be applied to determine whether a warrantless arrest was lawful:

> The Supreme Court has held that the test for whether an arrest is constitutionally valid is "whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *see United States v. Thomas,* 11 F.3d 620, 627 (6th Cir.1993), *cert. denied,* 511 U.S. 1043, 114 S.Ct. 1570, 128 L.Ed.2d 214 (1994).

*Id.* at 230. The Sixth Circuit has further explained that probable cause is "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Padro,* 52 F.3d 120, 122–23 (6th Cir.1995). Simply stated, the fact that a person identified the Defendant as the person he had seen run from the Key Bank branch, the fact that the officers observed currency flying from the coat of the Defendant's companion and the temporal and spatial proximity between the Defendant's seizure and the robbery, convince this Court that there existed reasonable grounds for belief (i.e., probable cause to believe) that the Defendant had robbed that financial institution.

Accordingly, the Court overrules the Defendant's Motion to Suppress Evidence (Doc. # 38).