**UNITED STATES of America,**
**Plaintiff,**

v.

**John Richard MAYHEW,**
**Jr., Defendant.**

**No. 2:03–cr–165.**

United States District Court,
S.D. Ohio,
Eastern Division.

June 22, 2005.

916

See also 337 F.Supp.2d 1048.

David DeVillers, United States Attorney, Salvador A. Dominguez, U.S. Attorney's Office, Columbus, OH, for Plaintiff.

Frederick Douglas Benton, Columbus, OH, Isiah Gant, Nashville, TN, Steven Scott Nolder, Federal Public Defender, Columbus, OH, for Defendant.

## *OPINION AND ORDER*

MARBLEY, District Judge.

## I. INTRODUCTION

This matter is before the Court on the following motions: (1) Defendant's Motion to Suppress Statements; (2) Defendant's Motion in Limine to Exclude Evidence of The Accused's Prior Convictions and Other Acts; and (3) Defendant's Motion to Exclude Any Evidence Relating to Other Crimes, Wrongs, or Acts. On June 10, 2005, the Court heard oral arguments on the above Motions. For the following reasons, the Court **DENIES** Defendant's Motion to Suppress Defendant's Statements for Fifth and Sixth Amendment violations [Docket No. 52]; the Court **GRANTS** in part and **DENIES** in part Defendant's Motion to Exclude Defendant's Statements Pursuant to Federal Rules of Evidence 401, 402, 403, and 404(b) [Docket No. 50]; and the Court finds Defendant's Motion to

Exclude Any Evidence of Other Crimes, Wrongs, or Acts [Docket No. 46] not ripe for decision.

## II. BACKGROUND

The essential background facts, as alleged by the government, are as follows. On the night of August 7, 2003, Defendant went to a home at 2258 Springmont Avenue, Columbus, Ohio, where he shot and killed his ex-girlfriend, Tamara McKibben, and her fiancé, Frank Rigsby. While at the residence, he threatened Tamara McKibben's son, Andy Aspell, Jr., with his gun. Defendant then kidnaped his and Tamara McKibben's daughter, Christina McKibben, from the home. Defendant took Christina McKibben with him in his car and drove with her to West Virginia. On August 9, 2003, Defendant, still with Christina McKibben in the car, was pulled over by a West Virginia state trooper for a minor traffic offense. When the officer approached the car, Defendant drew a gun and shot the officer. A 30–minute car chase ensued. Defendant ultimately was stopped by a roadblock and tire spikes. While police were ordering him to exit the car, Defendant shot Christina McKibben twice, then shot himself once in the chest. Police pulled both people from the car, and Christina McKibben told the police that she was from Columbus and that there was a bomb in the car. Two bombs were found under the front seats of the vehicle. Christina McKibben died en route to the hospital.

Paramedics took Defendant, via ambulance, to a West Virginia hospital. After Defendant was loaded into the ambulance, one police officer read Defendant his *Miranda* rights while another officer observed the *Miranda* rights administration.[1] Defendant waived his *Miranda*

---

1. Lieutenant David Livingston of the Greenbrier County Sheriff's Department conducted the majority of the interrogation.

rights and the officers proceeded to interrogate Defendant. During both the *Miranda* administration and Defendant's subsequent interrogation, an emergency medical technician ("EMT") and a paramedic treated Defendant for the gunshot wound. The vast majority of the ambulance ride was recorded on an audio-videotape, which the Court has viewed in-camera.[2] Defendant made several statements during the ambulance ride, including the following:

1. Defendant admits to killing Tamara McKibben and Frank Rigsby with a Tech 9;

2. Defendant asks if West Virginia has the death penalty;

3. Defendant admits that he has been to prison for Aggravated Burglary and Kidnaping with Gun Specifications;

4. Defendant informs Detective Livingston that he has additional firearms—namely a 12–gauge shotgun and a .22 Magnum Marlin bolt-action rifle—at his home at 28 North Princeton Avenue in Columbus;

5. Defendant states that he is aware that the police have been to his house since the double homicide;

6. Defendant denies planning the murder of Tamara McKibben and Frank Rigsby, stating it happened because Christina McKibben "coaxed" him into doing it;

7. Defendant pleads with medics to let him die and states "saving me is a waste of time and taxpayers" money;

8. Defendant acknowledges that Ohio has the death penalty;

9. Defendant responds in the affirmative when asked if his statements to the officer were voluntary.

On October 2, 2003, the government issued a seven count Indictment charging Defendant with the following offenses:

(1) that he "did willfully and unlawfully kidnap, abduct and carry away Christina McKibben and willfully transport Christina McKibben in interstate commerce from the Southern District of Ohio to the state of West Virginia, and did hold her for ransom, reward or otherwise, resulting in the death of Christina McKibben";

(2) that, having been convicted of a felony in 1992, for the offense of kidnaping with gun specification, he "knowingly possessed a firearm, that is, an Intratec, Model Tec 9, .9mm pistol, the said firearm having been shipped and transported in interstate commerce";

(3) that he "did knowingly transport or receive, in interstate commerce, an improvised explosive device with the knowledge or intent that it would be used to kill, injure, or intimidate any individual or unlawfully to damage or destroy a vehicle, or other real or personal property";

(4) that he "did knowingly possess a firearm, that is, an improvised explosive device, not registered to him in the National Firearms Registration and transfer record as required in 26 U.S.C. § 5841";

(5) that he "did knowingly possess an unregistered firearm, that is, an improvised explosive device, not identified by a serial number, as required in 26 U.S.C. § 5842";

(6) that he "did knowingly travel in interstate commerce, with the intent to

---

**2.** The videotape, dated August 9, 2003, begins at 8:43 p.m. and ends at 9:04 p.m. The videotape recorded the vast majority of the drive to

the hospital, which was approximately sixteen miles from the scene of the incident.

injure, harass and intimidate ... Christina McKibben ..., and in the course of and as a result of such travel ... placed Christina McKibben in reasonable fear of death and serious bodily injury, and such acts resulted in the death of Christina McKibben"; and

(7) that he "did knowingly use, carry, brandish and discharge a firearm, that is, a pistol, and did knowingly carry an unregistered destructive device, all during and in relation to a crime of violence, for which he may be prosecuted in a court of the United States [for] interstate stalking in violation of 18 U.S.C. § 2261A(1), and in so doing, [he] committed murder ... with malice aforethought, such murder being willful, deliberate, malicious and premeditated."

Defendant filed the above Motions at October 1, 2004. The government filed a Consolidated Response on November 24, 2004.

## III. ANALYSIS

The Court first addresses Defendant's Motion to Suppress the incriminating statements he made in the ambulance ("ambulance statements") on the grounds that his waiver of *Miranda* rights and all subsequent statements were involuntary. The Court then turns to Defendant's alternative argument, in which he claims that these ambulance statements should be excluded because they are either irrelevant or too prejudicial pursuant to Federal Rules of Evidence 401, 402, 403, and 404(b). Finally, the Court addresses briefly Defendant's Motion to Exclude Any Evidence of Other Crimes, Wrongs, or Acts.

### A. Motion to Suppress

Defendant moves to suppress the ambulance statements, claiming that the police violated his Fifth Amendment privilege against self-incrimination, his Fifth and

Fourteenth Amendment rights to due process of law, and his Sixth Amendment right to counsel. For the following reasons, the Court concludes that Defendant voluntarily waived his *Miranda* rights and voluntarily made incriminating statements following the waiver. Furthermore, Defendant's Sixth Amendment right to counsel had not yet attached when he was in the ambulance. Thus, Defendant's Motion to Suppress is **DENIED.**

### 1. Fifth Amendment Rights

The Court first addresses Defendant's threshold argument that Lt. Livingston failed to advise properly Defendant of his *Miranda* rights. The Court then turns to Defendant's arguments that both the *Miranda* waiver and any subsequent statements were involuntary due to police coercion and because Defendant could not have knowingly waived his rights. The voluntariness of Defendant's *Miranda*-waiver is a separate inquiry from the voluntariness of the statements made subsequent to the waiver; however, both inquiries turn on the same facts and circumstances. Thus, the Court touches briefly on each inquiry, but then combines the factual analysis, and concludes that both Defendant's waiver of his *Miranda* rights and his subsequent statements did not violate Defendant's Fifth Amendment rights.

### a. Completeness of *Miranda* Rights

■ As a threshold matter, Defendant argues that Lt. Livingston failed to advise him properly of his *Miranda* rights by neglecting to ask Defendant explicitly whether Defendant understood his rights.

■ The transcript reads:

Lt. Livingston: Listen to me, John. You have the right to remain silent and refuse to answer questions. Anything you say can and will be used against you in a court of law.

Mayhew: (Unintelligible).

Livingston: Let me read you your rights, though. (Unintelligible).

\* \* \*

Livingston: Anything you say can and will be used against you in a court of law. You have the right to consult an attorney before you (unintelligible), to have an attorney present during any questioning now or in the future. If you do not have an attorney available, you have the right to remain silent until you've had the opportunity to consult with one.

Now that you've been advised of your rights, are you willing to talk to the police without an attorney present?

Mayhew: Yeah.[3]

Livingston: Okay.

(Videotape Tr. at 2–3).[4]

Although the Court would have preferred an explicit question asking Defendant whether he understood his rights, the lack of such a question does not vitiate the legality of Defendant's waiver. The Supreme Court has "never insisted that *Miranda* warnings be given in the exact form described in [the *Miranda*] decision." *Duckworth v. Eagan,* 492 U.S. 195, 203, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989). The relevant inquiry is whether "the warning given 'touched all of the bases required by *Miranda,*'" which include warning the suspect, prior to questioning, "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either re-

tained or appointed." *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *United States v. Hopson,* 134 Fed.Appx. 781, 786–87 (6th Cir. 2004) (citing *Duckworth,* 492 U.S. at 203, 109 S.Ct. 2875); however, there is no "talismanic incantation required to satisfy its strictures." *California v. Prysock,* 453 U.S. 355, 359, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981). Neither the *Miranda* decision nor its progeny require the police to ask a suspect explicitly whether he understands his rights. In the case sub judice, Lt. Livingston's reading of Defendant's *Miranda* rights included all required warnings; thus Defendant's argument is without merit.

**b. Waiver of *Miranda* Rights**

██ In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that the privilege against self-incrimination protects individuals from "informal compulsion exerted by law-enforcement officers during in-custody questioning." *Id.* at 461, 86 S.Ct. 1602. Unless a suspect knowingly, voluntarily, and intelligently waives these rights, a court will exclude statements made as a result of an involuntary waiver. *See Pennsylvania v. Muniz,* 496 U.S. 582, 589, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990).

██ A waiver of *Miranda* rights must be made be "voluntarily, knowingly and intelligently." *Miranda,* 384 U.S. at 444, 475, 86 S.Ct. 1602. The inquiry has "two distinct dimensions." *Moran v. Burbine,*

---

**3.** The Court notes that the police did not secure Defendant's written waiver of his rights. A written waiver, however, is not a prerequisite to a valid *Miranda* waiver. *See United States v. Johnson,* 351 F.3d 254, 263 (6th Cir.2003) ("The mere absence of a written waiver will not support the conclusion that there was no waiver.") (citing *United States v. Miggins,* 302 F.3d 384, 397 (6th Cir.2002) ("Although [the defendant] suggests that his waiver was not knowingly, voluntarily

and intelligently made because he did not sign a waiver form listing his rights, he offers no authority, and none can be found, for the proposition that a written waiver is necessary to establish a knowing, intelligent and voluntary waiver of *Miranda* rights.")).

**4.** The Court had the audio-videotape transcribed by Professional Reporters, Inc (hereinafter "Videotape Tr.").

475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id.* at 421, 106 S.Ct. 1135 (internal citations omitted); *see also Machacek v. Hofbauer*, 213 F.3d 947, 954 (6th Cir.2000) (echoing the *Moran v. Burbine* requirement that the waiver be both knowing and voluntary). The burden of proof of the voluntariness of the waiver is on the government by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

### c. Voluntariness of Statements Made Subsequent to Waiver

■ Turning to the applicable standard for the voluntariness of statements made subsequent to a *Miranda* waiver, the Court must consider many of the same factors used in the *Miranda* analysis: (1) police coercion; (2) interrogation length; (3) interrogation location; (4) interrogation continuity; (5) the suspect's maturity; (6) the suspect's education; (7) the suspect's physical condition and mental health; and (8) whether the suspect was advised of *Miranda* rights. *Withrow v. Williams*,

507 U.S. 680, 693–94, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993). Notwithstanding this multi-factored test, "coercive police activity is a necessary element for finding that a confession was involuntary." *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Indeed, "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." [5] *Id.* at 164, 107 S.Ct. 515. The burden of proof of the voluntariness of any statements following the waiver is on the government by a preponderance of the evidence. *Connelly*, 479 U.S. at 168, 107 S.Ct. 515.

### d. Application of Facts

Defendant asserts that the same circumstances make both his *Miranda* waiver and all subsequent statements invalid. Specifically, Defendant claims that "the officers leveraged ... [his] need for critical medical treatment to extract a variety of specific admissions designed ... to incriminate [Defendant]." (Def. Mot. to Suppress at 4). Defendant asserts that even though he complained of blood in the back of his throat and "emit[ted] audible sounds associated with pain and discomfort," the police continued to interrogate him. Moreover, Defendant asserts that the officers "removed the oxygen mask so that [his] statements could be recorded," arguing that "each time the mask was removed, the medics returned the mask over the mouth and nose of [Defendant]." *Id.* at 3. Defendant also argues that he was generally confused at the time, and could not have knowingly waived any rights or made

---

**5.** In *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir.1988), the court enumerated three conditions that a confession must satisfy to be considered involuntarily given: (1) "the police 'extorted' [the confession] from the accused by means of coercive activity"; (2) "the 'coercion' in question was sufficient to overbear the will of the accused"; and (3) "petitioner must prove that his will was overborne *because* of the coercive police activity in question." *Id.* (citations omitted).

any statements, noting both that the EMT report stated as such, noting the suspect was "confused to time/place/surroundings," *see* Def. Ex. A, and that the days' events were so traumatic that his ability to think clearly was affected.

The government concedes that "it is evident from the video taped statement that the defendant was in pain during questioning" but argues that "he clearly expressed his willingness to talk to the officer" and made a number of "unsolicited voluntary statements." (Gov't Resp. at 4). The government contends that the questioning in no way impeded Defendant's medical treatment. *Id.* Moreover, the government points to the number of inquiries *by* the defendant *to* the officer as evidence that Defendant was aware of the nature and possible consequences of the statement he gave to the officer. Thus, the government urges the Court to find that neither Defendant's waiver nor any subsequent statement was involuntary. *Id.*

The government's argument is well-taken. Under the totality of the circumstances test, which the Sixth Circuit has applied to both the *Miranda* waiver and the voluntariness of subsequent statement, the videotape reveals that Defendant's waiver of his *Miranda* rights was voluntary, knowing and intelligent and that all subsequent statements were voluntarily made without police coercion.

**i. No Evidence of Police Coercion**

Although "there is no rule against interrogating suspects who are in anguish and pain," the police "may not prolong or increase a suspect's suffering against the suspect's will" nor "give the impression that severe pain will be alleviated only if the declarant cooperates." *Chavez v. Martinez*, 538 U.S. 760, 796–97, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (Kennedy, J., concurring in part and dissenting in part). In *Mincey v. Arizona*, 437 U.S. 385, 387, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), the

Supreme Court found that the police exploited the defendant's condition as such when officers interrogated the defendant, who had been shot in the leg during a narcotics raid. *Id.*

Mincey was brought to the hospital after the shooting and taken immediately to the emergency room where he was examined and treated. He had sustained a wound in his hip, resulting in damage to the sciatic nerve and partial paralysis of his right leg. Tubes were inserted into his throat to help him breathe, and through his nose into his stomach to keep him from vomiting; a catheter was inserted into his bladder. He received various drugs, and a device was attached to his arm so that he could be fed intravenously. He was then taken to the intensive care unit.

*Id.* at 396, 98 S.Ct. 2408.

That evening, officers came to the hospital to interrogate defendant. *Id.* at 398, 98 S.Ct. 2408. At this point, the defendant was still in the intensive care unit and claimed that the pain in his leg was "unbearable." *Id.* Because defendant's breathing tube prevented him from speaking, defendant wrote his responses to the officer's questions on a piece of paper. *Id.* Moreover, the officer ceased interrogation only when defendant lost consciousness or received medical treatment, even though defendant repeatedly requested counsel and complained that he was confused. *Id.* at 399–401, 98 S.Ct. 2408. Upon examination of the defendant's marginally coherent written responses, the Supreme Court found that defendant was confused and unable to think clearly during the interrogation. *Id.* at 398–99, 98 S.Ct. 2408. The Court ruled that the defendant's statements were involuntary, as they "were the result of virtually continuous questioning of a seriously and painfully wounded man on the edge of consciousness." *Id.* at 401, 98 S.Ct. 2408.

Similarly, in *Beecher v. Alabama,* an African–American petitioner had been accused of raping and killing a white woman. After fleeing into an open field, the police, who had been chasing him, fired a bullet into his right leg. As explained by the Supreme Court:

> By June 22, the petitioner's right leg, which was later amputated, had become so swollen and his wound so painful that he required an injection of morphine every four hours. Less than an hour after one of these injections, two Alabama investigators visited him in the prison hospital.... In the course of a 90–minute 'conversation,' the investigators prepared two detailed statements similar to the confession the petitioner had given five days earlier at gunpoint in Tennessee. Still in a 'kind of slumber' from his last morphine injection, feverish, and in intense pain, the petitioner signed the written confessions thus prepared for him.

*Beecher v. Alabama,* 389 U.S. 35, 36–37, 38, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967) ("[T]he uncontradicted facts set forth above lead to the inescapable conclusion that the petitioner's confessions were involuntary.").

In contrast, the court in *Abela v. Martin,* 380 F.3d 915 (6th Cir.2004), recently declined to apply *Mincey,* finding the facts in *Abela* did not support a finding of coercion.[6] There, the defendant arrived at the emergency room with a broken nose and several other fight-related injuries; yet, the police interview occurred before the defendant received treatment for his injuries. Additionally, his interview with the police had to be stopped briefly because "Abela was vomiting from the effects of the previous night's alcohol." *Id.* at 928.

The court, however, concluded that there was no evidence of police coercion, noting that there was "no indication that he was still drunk during his interrogations or that his mental faculties were in any other respect impaired during questioning as a result of alcohol or medication." *Id.* The court contrasted the seriousness of the situation in *Mincey* with the situation presented in *Abela* and found the latter was not "sufficiently analogous to the grave medical condition[ ]" presented in *Mincey:*

> [A]lthough we are sympathetic to Abela's uncomfortable state in the hospital and police station, Abela has not shown that the facts of this case are equivalent to those in *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) or *Beecher v. Alabama,* 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967), where the U.S. Supreme Court held involuntary the statements of wounded men. In those cases, the petitioners' injuries were more severe and there was clear evidence of a coercive environment.

*Id.* at 928.

■ Applying the reasoning in *Mincey* and *Abela* to the case sub judice, the Court finds neither evidence of police coercion nor evidence that the police exploited Defendants' condition to obtain inculpatory statements. First, Lt. Livingston had legitimate reasons for interrogating Defendant immediately, as opposed to waiting until Defendant arrived at the hospital. As Lt. Livingston testified at oral argument, he learned, prior to the ambulance ride, that Defendant had wired his car with explosives. Lt. Livingston reasonably believed that his fellow officers may be endangered and wanted to elicit as much information as possible.[7] Additionally, once Lt. Livingston began questioning

---

6. The statements were, however, suppressed on the grounds that the defendant's Fifth Amendment right to counsel was violated when the police continued to question defen-

dant after he had requested counsel. *Abela,* 380 F.3d at 915, 925.

7. On direct, Lt. Livingston testified as follows:

Defendant, Lt. Livingston learned almost immediately that Defendant had killed two people in Ohio.[8] Lt. Livingston testified that he needed to find out if these people could be saved and to determine who else may have been in danger.

Second, there is no indication that the police impeded Defendant's access to medical care at any point during the ambulance ride. Defense counsel argued that the videotape revealed tension between the paramedics and Lt. Livingston, which manifested itself, most blatantly, when Lt. Livingston, on several occasions, pulled Defendant's oxygen mask down toward his lower lip and chin in an apparent effort to hear clearly Defendant's words. (Motion to Suppress Hearing Transcript at 61–64, 70, 75) (hereinafter "Hrg. Tr."). After extensively reviewing the videotape,[9] the Court finds no evidence of tension between Lt. Livingston and the emergency medical personnel aiding Defendant. To the contrary, the Court notes two separate occasions on which Lt. Livingston, who is a trained emergency medical first responder,[10] aided the paramedics: (1) Lt. Livingston helped to hold Defendant in a certain position to facilitate the removal of Defendant's handcuffs (Videotape Tr. at 21, 23);[11] and (2) Lt. Livingston recalled placing the "refurb mask back on his face at one point." (Hrg. Tr. at 43). Furthermore, no evidence was adduced that Defendant needed a continuous flow of supplemental oxygen. As Lt. Livingston testified, an oxygen mask "is one of the responses to treat anybody that you put in an ambulance is put an oxygen mask on them." (Hrg. Tr. at 47). In an attempt to ensure that Defendant was not

---

Q: Why were you asking Mr. Mayhew about explosives?

A: Because he had mentioned that when he was laying alongside of the road when I first came up to the scene.

\* \* \*

Q: Was this critical information for you to ascertain from Mr. Mayhew?

A: Yes. There [were] still numerous officers there and I didn't want the vehicle to blow up. And it [was] also in a semi-populated area.

(Hrg. Tr. at 24). Indeed, the car was wired with toggle switch that Defendant apparently intended to detonate, but he "didn't have it plugged in at the time." (Videotape Tr. at 10).

8. The videotape transcript reads:

Lt. Livingston: Tell me what happened. What happened?

\* \* \*

Defendant: I couldn't afford to be stopped.

Q: Why couldn't you afford to be stopped?

A: Because I killed two people in Columbus.

(Videotape Tr. at 5).

9. At oral argument, both defense counsel and the government each played the twenty-minute videotape for the Court, stopping the videotape at every relevant point to ask Lt. Livingston, who was then testifying, about every action, question, and response that occurred during the ambulance ride.

10. On direct examination, Lt. Livingston testified that he had received the following training in health-related emergencies:

Lt. Livingston: I have had military training in first aid through the U.S. Army, also through the U.S. Air Force, and also through the Reserves. I have started training as a combat life support on two different occasions ... and I am also a first responder, emergency medical first responder.

(Hrg. Tr. at 16).

11. The videotape transcript reads as follows:

Mr. Dominguez: At that point, Lt. Livingston, it appears that you had put on gloves at this point.

Lt. Livingston: Yes.

Q: What were you doing, if you remember.

A: He said roll him towards David. That would be me. I asked him what do you need him to do. And they said hold him.

Q: So you were assisting?

A: Yes.

(Hrg. Tr. at 22–23).

in need of continuous supplemental oxygen, the Court asked Lt. Livingston the following questions: [12]

> Q: During the ride, did any medical personnel indicate that Mr. Mayhew needed to be on continuous oxygen?
>
> A: No sir.
>
> Q: Was there any discussion about the oxygen that you overheard?
>
> A: I asked him if it's all right to remove the mask to speak to him. They said yes, it was.

(Hrg. Tr. at 70–71).

Third, with regard to Defendant's degree of physical pain, the Court recognizes that Defendant complained of pain several times throughout the ride, that the bullet wound was "through and through," [13] and that Defendant had his eyes closed when he was loaded onto the ambulance, prompting the paramedics to instruct him to open his eyes. [14] The Court also notes that the paramedics used a blood pressure cuff and an intravenous drip to treat him. (Hrg. Tr. at 55). The videotape, however, is dispositive in this case. Defendant did not lose consciousness at any point during the ambulance ride. [15] Moreover, although Defendant appears to have been in moderate pain, as evidenced by grimaces and moans, he never complained of pain analogous to "unbearable" discomfort. *See, e.g., Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) ("He complained to the police officer" that the pain in his leg was " 'unbearable.' "). Defendant was able to move his body in response to paramedics requests to turn over, demonstrating the wound, while it may have been severe, was not wholly debilitating. Finally, there was no indication that Defendant either needed or received any type of mind-altering pain medication during the ambulance ride. [16]

Fourth, Defendant's decision to volunteer information to Lt. Livingston on at least two occasions belies Defendant's claim of police coercion. First, Defendant clarified for Lt. Livingston the run-in with the state trooper:

> Lt. Livingston: That's why you shot at the office that stopped you tonight, because you tried to get him and then yourself, right?

(Hrg. Tr. at 45).

---

**12.** The Court specifically asked these questions because of Lt. Livingston's testimony that at 8:47 p.m., Defendant stated that he was having trouble breathing. (Hr. Tr. at 55).

**13.** On the videotape, the paramedics used the term "through and through" to describe the wound. (Hrg. Tr. at 46).

**14.** At approximately 8:44 p.m. on the videotape, a paramedic or EMT says, "John, open your eyes." (Hrg. Tr. at 54–55).

**15.** The videotape does not reveal any moment during which the Defendant was not conscious. On cross-examination, Lt. Livingston confirmed as such:

> Q: Do you recall Mr. Mayhew at any time losing consciousness—let me be specific—from the time of your initial contact with Mr. Mayhew until such time that he arrived at the hospital?
>
> A: No sir.

**16.** Defendant had not ingested any substances either. When asked by Detective Livingston if he was on any medication or intoxicated in any way, Defendant replied in the negative.

> Q: John, you're not on anything, any medications at all?
>
> A: No.
>
> * * *
>
> Q: Are you taking any dope?
>
> A: No.
>
> Q: Not smoking pot, not shooting up anything?
>
> A: No. I don't believe in any drugs.
>
> Q: Okay. You're not drinking anything, alcohol-wise?
>
> A: No.
>
> Q: No. So your mind was clear. You mind is clear now, other than being shot?
>
> A: As clear as a crazy person can be.

(Videotape Tr. at 11, 19)

Defendant: Yeah. *Listen, I'll give it to you straight.*

Lt. Livingston: Ok. Give it to me straight.

Defendant: I pulled the gun out. The safety was on, or I would have got him in the face.

(Videotape Tr. at 16) (emphasis added).

Shortly thereafter, Defendant voluntarily expounded upon the killing of Frank Rigsby and Tamara McKibben:

Lt. Livingston: In other words, they were stopping you from in the house?

Defendant: Yes, yes, yes.

Lt. Livingston: Okay, Okay. Good enough. Good enough.

Defendant: Look.

Lt. Livingston: Look what?

Defendant: It's plain and simple.

Lt. Livingston: Okay.

Mr. Mayhew: I killed them.

Lt. Livingston: Okay.

Mr. Mayhew: I regret the fact that I did it, and I've lived with the images that I did it ever[ ] since . . .

(Videotape. Tr. at 26–27)

The Court finds that these voluntary statements have a high indicia of reliability. In *Chavez v. Martinez,* Justice Kennedy, concurring in part and dissenting in part, noted that when a suspect is in fear of dying, that fear "may be a motivating factor to volunteer information," and analogized the scenario to the dying declaration exception ensconced in the laws of evidence. *Chavez v. Martinez,* 538 U.S. 760, 797, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (Kennedy, J., dissenting in part and concurring in part) (citing *Mattox v. United States,* 146 U.S. 140, 152, 13 S.Ct. 50, 36 L.Ed. 917 (1892) ("The admission of the testimony is justified upon the ground of

necessity, and in view of the consideration that the certain expectation of almost immediate death will remove all temptation to falsehood, and enforce as strict adherence to the truth as the obligation of an oath could impose") and Fed. Rule Evid. 804(b)(2) (providing an exception from the hearsay rule for certain statements uttered under belief of impending death)). Thus, Defendant may have felt compelled to speak truthfully because of his precarious state, even though doing so may have "increase[d] his pain and agony." *Chavez* at 797, 123 S.Ct. 1994 ("The Constitution does not forbid the police from offering a person an opportunity to volunteer evidence he wishes to reveal.").

 Finally, although not dispositive by any means, the Court notes that Defendant indicated that he voluntarily waived his rights without police coercion. The transcript reads:

Mayhew: Okay. Now, can I have some time to myself here, please?

Livingston: Sure Buddy. I'm going to turn this tape recorder off. Before I turn it off, is there anything else you want to tell me?

A: 'No.

Q: Nobody forced you in any way to give this statement, did they?

A: No.

Q: You gave it of your own free will?

A: Yeah.

Q: Nobody is twisting your arm nobody is grabbing ahold of you or keeping you from medical attention, are they?

A: No.

Q: So, again, that was a voluntary statement of your own free will?

A: Yeah.[17]

---

**17.** During Lt. Livingston's cross-examination, defense counsel argued that these questions indicated Lt. Livingston's concern that Defen-

dant's statement was not voluntary. Lt. Livingston convincingly dispelled this assumption.

Tr. at 27–28.[18]

In sum, the court finds no evidence of police coercion. Defendant's waiver and statements were "voluntary in the sense that [they were] the product of a free and deliberate choice rather than intimidation, coercion or deception." *Moran v. Burbine*, 475 U.S. at 421, 106 S.Ct. 1135.

### ii. Knowing and Intelligent Waiver[19]

■ With regard to Defendant's degree of mental capacity at the time of his

Q: Why were you so concerned with having Mr. Mayhew say to you that his statement was voluntary and that you did not interfere with his medical treatment?

A: That is a question that I ask everyone that I interview if the statement was given voluntarily. No threats or coercion of any kind were used against you.

Q: Were you concerned that someone might interpret your actions as being coercion and/or interfering in Mr. Mayhew's medical treatment?

A: No sir. As I said, that's a statement that I ask any person that I interview. That it is a voluntary statement.

(Hrg. Tr. at 49).

18. Because this voluntariness conversation ensued after Defendant had asked for some time alone, Defendant could argue (but did not) that the police violated Defendant's Fifth Amendment, which requires police to stop interrogation when a suspect is in custody and invokes the right to counsel, at least until counsel has been made available, or un[til] the suspect initiates further conversations or exchanges with the police. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). However, for a suspect to invoke his Fifth Amendment right to counsel, his request for counsel must be "clear and unambiguous." *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). This request for some time alone does not qualify as a clear and unambiguous request for counsel.

19. The inquiry regarding a suspect waiver of *Miranda* rights requires a Court to not only address the presence, if any of police coercion, but also requires the Court to determine whether the waiver was knowing and intelli-

waiver and throughout the ambulance ride's duration, the Court finds that although certain examples of confusion arose, the totality of the circumstances demonstrates that Defendant was lucid both when he waived his *Miranda* rights and when he made inculpatory statements.[20] Defense counsel argues that Defendant was clearly confused. Specifically, Defendant points to his lack of sleep,[21] his statement that he is a "crazy person";[22]

gent. *United States v. Bush*, 125 F.Supp.2d 845, 849 (S.D.Ohio 2000) (emphasizing that the voluntary and knowing prongs are distinct; stating, "the absence of police coercion renders a defendant's waiver of rights merely voluntary, as opposed to causing it to be both voluntary and knowing").

In contrast, the lack of police coercion is dispositive with regard to the voluntariness of Defendant's statements that he made after the *Miranda* waiver. *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) ("We hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."). For completeness, however, the Court addresses the remaining factors to be considered in a totality of the circumstances review of voluntariness of incriminating statements.

20. The Court recognizes that the lack of police coercion is dispositive with regard to the voluntariness of Defendant's statements that he made after the *Miranda* waiver. *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) ("We hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."). For completeness, however, the Court addresses the remaining factors to be considered in a totality of the circumstances review.

21. On Saturday, August 9, 2003, Defendant stated, "I haven't slept but an hour" since Thursday. (Videotape Tr. at 20).

22. Q: So your mind was clear. You mind is clear now, other than being shot?

his inability to state either the day of the week or the season,[23] and the EMT report, which stated that he appeared confused as to time, date, and surroundings.

Had the ambulance ride not been videotaped, these factors might have persuaded the Court that Defendant was not of sound mind when he incriminated himself; however, the Court concludes, based primarily on its review of the videotape, that Defendant's mind was clear and that he was able to comprehend the import of his *Miranda* waiver. First, Defendant interjected himself into Lt. Livingston's reading of the *Miranda* rights to assert his familiarity with these rights. As Lt. Livingston testified:

> Q: When you first attempted to read Mr. Mayhew his *Miranda* rights, did he provide a response to you?
>
> A: He said I know my rights. And I advised him that I still had to read them to him so there would be no questions that he understood his rights.[24]

(Hrg Tr. at 16); *see also* (Hrg. Tr. at 19) (Lt. Livingston explains that "I told him I had to read him his *Miranda* rights. When I got the second part, he said I

A: As clear as a crazy person can be.
(Videotape Tr. at 19)

**23.** Q: John, what day of the week is it?

A: I don't know
\* \* \*
Q: Are we in spring, summer, fall, or winter?
A: I don't know
(Videotape Tr. at 19–20).

**24.** Although Defendant's words are difficult to discern from the videotape, the Court finds Lt. Livingston's testimony at oral argument is consistent with the tenor of Lt. Livingston's statement to Defendant that the *Miranda* warnings be read in full. There, Lt. Livingston insisted, "Let me read you your rights, *though*." (Videotape Tr. at 2) (emphasis added).

understand my rights. I told him I know he understands them but I still have to read them for him"). This knowledge of his rights is consistent with Defendant's experience in the criminal justice system, which militates in favor of the government's claim that Defendant knowingly waived his rights. *See Thornton,* 17 F.Supp.2d at 693–94 (recognizing the defendant's "past experience with the criminal justice system" as one factor in favor of finding that Defendant knowingly waived his rights).

Second, he not only coherently answered almost all of the questions posed, but he answered these questions with absolute accuracy. He was able to recite his past offenses with specificity and in chronological order, including the street on which Frank Rigsby and Tamara McKibben had been killed,[25] the type of guns he had in his car,[26] the make of other guns he owned,[27] the amount of money he had with him ($300), how many states he had traveled through since Thursday (ten states), and, most persuasively, he was able to accurately define the term "gun spec" for Lt. Livingston.

**25.** (Videotape Tr. at 14) (explaining that Frank Rigsby and Tamara McKibben lived on Springmont in Columbus, Ohio).

**26.** The transcript reads:

> Q: John, how many guns did you have in the car?
> A: Two.
> Q: What kinds? You had a Raven 25. What's the other one?
> A: A Tech–9.

(Videotape Tr. at 12).

**27.** The transcript reads:

> Q: Do you have more guns stored somewhere?
> A: I have a 12–gauge shotgun and a 22 magnum marlin bolt action rifle. They're at my house.

Q: So you've done a little bit of time, huh?

A: Eight-and-a-half years.

* * *

Q: Now what were you in jail for?

A: Ag burg, kidnapping, and gun [spec].

Q: Gun—what's that last—gun what?

A: Gun [Spec]. Use of a firearm in the commission of a felony crime.

(Videotape Tr. at 22).

Moreover, Defendant was able to link his actions to possible punishment, explicitly inquiring "Do they got the death penalty here?" [28]—referring, presumably, to West Virginia—and inquired as to whether Ohio had the death penalty.[29]

Defendant argues that his request for "some time alone" indicated that he was fatigued and "not in any condition to properly assess the consequence of any statement that he gave to the officers." (Def.'s Mot. to Suppress at 6). Notwithstanding this request for time alone, the Court notes that *Defendant* re-initiated conversation. After asking for some time to himself ("Now can I have some time to myself here, please?"), the police and paramedics talked amongst themselves for at least thirty seconds, at which point Defendant rekindled the conversation, by stating "You know, saving me is a waste of money." (Tr. at 29). Finally, Defendant has not argued, nor has the Court received any indication, that Defendant lacked the intellectual capacity to have understood his rights.

In sum, the Court finds that Defendant's *Miranda* waiver was made voluntarily, knowingly, and intelligently, and that all statements made subsequent to the waiver were made free from police coercion and with mental clarity.

## 2. Sixth Amendment Rights

■ Defendant claims that the officers denied him his Sixth Amendment right to counsel, but does not offer any supporting authority.[30] Defendant's argument fails. Defendant had no Sixth Amendment right to counsel during custodial interrogation because it "preceded the formal initiation of adversary judicial proceedings." *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). The Supreme Court explained:

For an interrogation, no more or less than for any other "critical" pretrial event, the possibility that the encounter may have important consequences at trial, standing alone, is insufficient to trigger the Sixth Amendment right to counsel. As *Gouveia*[31] made clear, until such time as the " 'government has committed itself to prosecute, and ... the adverse positions of government and defendant have solidified' " the Sixth Amendment right to counsel does not attach. 467 U.S., at 189, 104 S.Ct., at 2298 (quoting *Kirby v. Illinois, supra,* 406 U.S., [682] at 689, 92 S.Ct., [1877] at 1882 [32 L.Ed.2d 411 (1972)]). Because, as respondent acknowledges, the events that led to the inculpatory statements preceded the formal initiation of adversary judicial proceedings, we reject the contention that the conduct of the police violated his rights under the Sixth Amendment.

(Videotape Tr. at 24).

**28.** (Videotape Tr. at 16).

**29.** (Videotape Tr. at 29) ("Let me ask you a question. Does Ohio have the death penalty?").

**30.** In criminal prosecutions, the Sixth Amendment allows "the accused [to] enjoy the right ... to have the Assistance of Counsel for his defense." U.S. CONST. amend. VI.

**31.** *United States v. Gouveia,* 467 U.S. 180, 188, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984).

*Id.* at 431–32, 106 S.Ct. 1135; *see also United States v. Moody,* 206 F.3d 609, 614 (6th Cir.2000) (citing *Moran* for the proposition that an accused's Sixth Amendment right "becomes applicable only when the government's role shifts from investigation to accusation"). Thus, Defendant's Sixth Amendment right to counsel had not yet been triggered and thus, was not violated.

### B. Motion to Exclude Statements Made in Ambulance on Other Grounds

Defendant argues that, regardless of the Court's outcome on the alleged violations of the Fifth and Sixth Amendments, the Court should exclude the statements made in the ambulance because they are irrelevant and prejudicial, citing Federal Rules of Evidence 401, 402, 403, and 404(b). Defendant contests the admissibility of the following nine statements:

10. Defendant admits to killing Tamara McKibben and Frank Rigsby with a Tech 9;

11. Defendant asks if West Virginia has the death penalty;

12. Defendant admits that he has been to prison for Aggravated Burglary and Kidnaping with Gun Specifications;

13. Defendant informs Detective Livingston that he has additional firearms—namely a 12-gauge shotgun and a .22 Magnum Marlin bolt-action rifle—at his home at 28 North Princeton Avenue in Columbus.

14. Defendant states that he is aware that the police have been to his house since the double homicide;

15. Defendant denies planning the murder of Tamara McKibben and Frank Rigsby, stating it happened because Christina McKibben "coaxed" him into doing it;

16. Defendant pleads with medics to let him die and states "saving me is a waste of time and taxpayers" money;

17. Defendant acknowledges that Ohio has the death penalty;

18. Defendant responds in the affirmative when asked if his statements to the officer were voluntary.

As a general matter, Defendant argues that these matters are not relevant to the indictment. FED.R.EVID. 401 (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").[32] Even if the statements are relevant, Defendant argues that they should be excluded pursuant to Rule 403, which states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

FED.R.EVID. 403. Defendant asserts that to determine whether to exclude the statements pursuant to Rule 403, the Court must consider whether other, less prejudicial, evidence is available to prove the point. *Old Chief v. United States,* 519 U.S. 172, 183, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) (explaining that a judge applying Rule 403 should "apply some discount to the probative value of an item of evi-

---

**32.** *See also* FED.R.EVID. 402 ("All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.").

dence when faced with less risky alternative proof going to the same point.").

For the following reasons, the Court hereby excludes Defendant's statements about the nature of his prior conviction (Statement 3), and his statement concerning the additional firearms. (Statement 4). The remaining statements (Numbers 1, 2, 5, 6, 7, 8 and 9) are admissible.

### 1. Excluded Statements

**a. Defendant admits that he has been to prison for Aggravated Burglary and Kidnaping with Gun Specifications (Statement 3)**

The Court resolved this issue in its Opinion and Order issued on September 27, 2004, in which it held that the government is precluded from raising the nature of Defendant's prior conviction for either the purpose of establishing the existence of that prior felony conviction or as a prior bad act under Rule 404(b). *United States v. Mayhew*, 337 F.Supp.2d 1048, 1058 (S.D.Ohio 2004). There, as here, Defendant offered to stipulate to his status as a convicted felon in Count 2,[33] contending that evidence of the nature of his prior conviction should be disallowed because of the substantial risk of prejudice. This Court, pursuant to *Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997), found that it was required to accept Defendant's offer to stipulate to the prior conviction element of the felon in possession charge (§ 922(g)(1)).[34] *Mayhew*, 337 F.Supp.2d at 1058 (citing *Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) (holding that a district court abuses its discretion when it rejects a defendant's offer to stipulate to the prior conviction element of a § 922(g)(1) offense and instead admits the full judgment record of a prior conviction, if the name or nature of the prior conviction increases the risk of a verdict tainted by improper considerations and the purpose of the evidence is solely to prove the prior conviction element). The Court further concluded that the nature of Defendant's prior conviction, although theoretically admissible as a prior bad act pursuant to Rule 404(b), would be precluded under Rule 403 because "the probative value of this evidence is slight ... [t]he danger of unfair prejudice, however, is substantial," noting that "[b]ecause of the similarity between the prior offense and the current alleged offense, the jury, upon hearing of the prior offense, could easily be seduced into a sequence of bad character reasoning.[35] *Id.* at 1058. It appears that Defendant and the government are having the same discussion in this set of papers. The Court's conclusions set forth in the September 27, 2004 opinion stand: Defendant shall stipulate to the fact of his prior conviction and the government is

---

33. Count 2 of the Indictment reads, in pertinent part:

On or about August 7, 2003, in the Southern District of Ohio, the defendant, having been convicted [of a felony in 1992], for the offense of kidnaping with gun specification, ... "knowingly possessed a firearm, that is, an Intratec, Model Tec 9, .9mm pistol, the said firearm having been shipped and transported in interstate commerce ... In violation of 18 U.S.C. §§ 922(g)(1).
*Id.*

34. In order to obtain a conviction under 18 U.S.C. § 922(g)(1), the relevant statute in

Count Two, the government must prove the following: (1) that Defendant had a prior felony conviction; (2) that Defendant possessed a firearm; and (3) that the firearm had traveled in or affected interstate commerce. *United States v. Kincaide*, 145 F.3d 771, 782 (6th Cir.1998).

35. The Court notes that prior conviction at issue occurred over ten years before the events in question in this case, and the victim at that time was not related to any of the August 2003 victims.

prohibited from raising the nature of Defendant's prior conviction.[36]

### b. Presence of Additional Guns in Columbus Residence (Statement 4)

 The government argues that Defendant's statement regarding the presence of a 12-gauge shotgun and a .22 Magnum Marlin bolt-action rifle at his home at 28 North Princeton Avenue in Columbus is relevant because the jury needs to know why the police obtained a search warrant for the residence. The Court disagrees, and finds no reason why the search warrant's basis has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED.R.EVID. 401. Thus, this statement is excluded because it is not relevant.

### 2. Admissible Statements

### a. Statements Regarding Deaths of Frank Rigsby and Tammy McKibben (Statements 1 and 6)

 Defendant argues that he is not on trial for the deaths of Tamara McKibben or Frank Rigsby; instead, he is on trial for the kidnaping and death of Christina McKibben. The crimes against McKibben–Aspell and Rigsby will be tried in Ohio state court at a later date. Defen-

dant argues that raising their deaths in the trial sub judice, even in passing, will confuse and irreparably prejudice the jury.

The government counters that the killing of Frank Rigsby and Tamara McKibben is relevant because the government must prove, as part of the kidnaping charge, that Christina McKibben was taken against her will. (Count 1 of the Indictment alleges that Defendant "did willfully and unlawfully kidnap, abduct and carry away Christina McKibben and willfully transport Christina McKibben in interstate commerce from the Southern District of Ohio to the state of West Virginia, and did hold her for ransom, reward or otherwise, resulting in the death of Christina McKibben" in violation of 18 U.S.C. § 1201).[37]

The government's argument is persuasive. The prosecution must prove beyond a reasonable doubt that Christina McKibben was taken against her will. *See Chatwin v. United States,* 326 U.S. 455, 464, 66 S.Ct. 233, 90 L.Ed. 198 (1946) (stating that the involuntariness of seizure and detention is the very essence of the crime of kidnapping); *United States v. Dixon,* 592 F.2d 329, 340 (6th Cir.1979) ("[T]he heart of the crime of kidnapping is a seizure and detention against the will of the victim.") (internal citations omitted). Likewise, the suggested jury instruction defines the term "kidnaps" in 18 U.S.C. § 1201 as "forcibly to hold, detain, or carry away a person against that person's will."[38] 2A

---

**36.** This ruling affects only the first phase of trial. The issue will be reached again if this case proceeds to the sentencing phase.

**37.** 18 U.S.C. § 1201, in pertinent part, reads:
(a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when—
(1) the person is willfully transported in interstate or foreign commerce, regardless of whether the person was alive when transported across a State boundary if the person was alive when the transportation began;

* * *
shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.
*Id.*

**38.** The suggested jury instruction requires the jury to find the following essential elements to find Defendant guilty under 18 U.S.C. § 1201:
(1) Defendant knowingly and wilfully seized, confined, kidnapped, abducted, or carried away the person named in the indictment;
(2) Christina McKibben was thereafter transported in interstate commerce

Kevin F. O'Malley, Jay E. Grenig, & Hon. William C. Lee, *Federal Jury Practice and Instructions* § 46.04 (5th ed.2000).

To prove that Christina was taken against her will, the government asserts that it can refer to uncharged offenses, such as the killing of Frank Rigsby and Tamara McKibben, because they are an integral part of Defendant's offense conduct and are not "extrinsic" to the crime and, thus, do not need to be analyzed under Federal Rule of Evidence 404(b).[39] To support this contention, the government cites to *United States v. Ivy*, a case from the Fifth Circuit, which holds: "Uncharged offenses committed during a kidnapping or as a motive for a kidnapping are not 'extrinsic' but 'integral parts' of the offense. Indeed, an account of the kidnapping without mention of the shooting would have been incomplete." *United States v. Ivy*, 929 F.2d 147, 152 (5th Cir. 1991) (finding that evidence that the defendant shot victim's companion in the head while the victim watched was an integral part of the kidnaping charge because it established that the victim, Patricia, reasonably believed defendant's threats to further harm her and her family if she did not comply with his wishes). The court in *Ivy* further explained that because the uncharged shooting was not extrinsic, analysis under 404(b) was not required.

Although not cited by the government, the Sixth Circuit has agreed with the logic set forth in *Ivy*, holding that uncharged offenses that are integral to the charged offense can be admitted without regard to admissibility under Rule 404(b). *See United States v. Price*, 329 F.3d 903, 904–05 (6th Cir.2003) (finding that a handgun course completion certificate, although evidence of an uncharged count of being a felon in possession of a firearm, was admissible to prove the charged count of firearm possession because the certificate tended to show that the defendant owned the gun at issue; holding "Rule 404(b) ... does not apply to evidence that itself is probative of the crime charged"); *see also United States v. DeClue*, 899 F.2d 1465, 1472 (6th Cir.1990) (concluding that evidence of a defendant's evasion of corporate taxes, an uncharged offense, was not 404(b) evidence because it directly implicated whether he properly reported income for the tax years at issue in the indictment; holding "[e]vidence which is probative of the crime charged and does not solely concern uncharged crimes is not 'other crimes' evidence").

To determine what constitutes an integral uncharged offense, as compared to an "extrinsic" offense contemplated by Rule 404(b), the Court must determine whether the challenged evidence is "inextricably intertwined" with evidence of the crime charged in the indictment. *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995) (concluding that evidence of an uncharged prior drug shipment was "inextricably intertwined" with evidence of the

---

while so seized, confined, kidnapped, or abducted; and

(3) Defendant held Christina McKibben for ransom, reward, or other benefit or reason.

*Federal Jury Practice and Instructions* § 46.03.

**39.** Federal Rule of Evidence 404(b) reads:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial. FED.R.EVID. 404(b).

drug shipment charged in the indictment because the latter was "to make up for a prior shipment which was short," and thus admissible as intrinsic evidence without regard to Rule 404(b)); *United States v. Toney*, 161 F.3d 404, 413 (6th Cir.1998) ("When the other crimes or wrongs occurred at different times and under different circumstances from the offense charged, the deeds are termed 'extrinsic.' 'Intrinsic' acts, on the other hand, are those that are part of a single criminal episode. Rule 404(b) is not implicated when the other crimes or wrongs evidence is part of a continuing pattern of illegal activity.") (internal quotation omitted); *see also United States v. Stafford*, No. 98–1187, 1999 WL 1111519, at *4 (6th Cir. Nov.24, 1999) ("Intrinsic acts are those that are inextricably intertwined with the criminal act charged or a part of the criminal activity as opposed to extrinsic acts, which are those that occurred at different times and under different circumstances from the offense charged").

The killings of Frank Rigsby and Tamara McKibben were intrinsic acts that were "inextricably intertwined" with the alleged kidnaping. Thus, they need not be analyzed under Rule 404(b) and are admissible as integral parts of the charged kidnaping offense.

The Court also finds that Defendant's statements denying that he planned the murders of Tamara McKibben and Frank Rigsby, stating it happened because Christina McKibben "coaxed" him into doing it, are similarly relevant to the determination of whether Christina McKibben willingly accompanied Defendant.[40]

### b. Statements Demonstrating Awareness of Law Enforcement (Statements 2, 5, 7 and 8).

 The Court finds the following statements relevant: Defendant's statement regarding West Virginia's imposition of the death penalty (Statement 2); Defendant's acknowledgment that the police had visited his house since Thursday (Statement 5); Defendant's request that he should be allowed to die so as not to waste the taxpayers' money (Statement 7); and Defendant's statement regarding Ohio's death penalty law (Statement 8). These statements are relevant to Defendant's understanding of the potentially criminal nature of his actions and the possibility that a punishment will result because of those acts.

### c. Statements Regarding Voluntariness (Statement 9)

 Notwithstanding a court's pretrial legal conclusion that a confession is voluntary, a jury must still retain its opportunity to evaluation the veracity and reliability of that confession. As explained by the Supreme Court in *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), "the requirement that the court make a pretrial *voluntariness* determination does not undercut the defendant's traditional prerogative to challenge the confession's *reliability* during the course of the trial." *Id.* at 688, 106 S.Ct. 2142; *see also* 18 U.S.C. § 3501(a) (requiring the judge to make a pretrial determination as to the voluntariness of any confession, and

---

**40.** The Defendant stated as follows to Lt. Livingston:

Q: So, you've been planning these murders up in Ohio for a while, haven't you?
A: No. I hadn't planned on it.
Q: Just a spur of the moment thing?
* * *
A: She got mean with me, and I got mad. And I did it.
Q: Who got mean with you?
A: Tammy McKibben. And when I tried to get her, Frank came between us, and I got him first.

(Videotape Tr. at 25–26).

"[i]f the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances").

### C. Defendant's Motion to Exclude Any Evidence Relating to Other Crimes, Wrongs, or Act

With this Motion, Defendant specifically asks the Court to prohibit *any* reference to the following topics during trial under pursuant to the Sixth Amendment and Federal Rules of Evidence 404(b) and 403.

(1) Defendant's prior conviction for Aggravated Burglary and Kidnaping; [41]

(2) Defendant's illegal possession of firearms as a convicted felon;

(3) Defendant's killing of Tamara McKibben Aspell and Frank Rigsby;

(4) Defendant's sexual relationship with his daughter; and

(5) Defendant's history of mental illness.[42]

The Court finds that these, with the exception of Defendant's history of mental illness, have already been addressed either by the Court or by stipulation. With regard to any evidence referencing Defendant's history of mental illness, this request is premature as no specific evidence has been adduced. Thus, the Court finds this Motion not ripe.

### IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's Motion to Suppress

Defendant's Statements for Fifth and Sixth Amendment violations [Docket No. 52]; the Court **GRANTS** in part and **DENIES** in part Defendant's Motion to Exclude Defendant's Statements Pursuant to Federal Rules of Evidence 401, 402, 403, and 404(b) [Docket No. 50]; and the Court finds Defendant's Motion to Exclude Any Evidence of Other Crimes, Wrongs, or Acts [Docket No. 46] not ripe for a decision.

**IT IS SO ORDERED.**

---

**41.** In the Court's September 27, 2004 order, the Court granted the Defendant's motion to strike the explanation of the conviction contained in Count 2 of the indictment (kidnaping with gun specification) if Defendant stipulates to his status as a convicted felon. The Court also granted Defendants motion to prevent the government from introducing evidence as to the nature of his prior felony conviction under 404(b).

**42.** Defendant cautions that this list is not exhaustive.